**BARCLAY & COMPANY, Inc.**

v.

**UNITED STATES.**

**Protest No. C.D. 2031; 214631–K.**

United States Customs Court,
First Division.

Oct. 9, 1958.

Lawrence & Tuttle, San Francisco, Cal. (Frank L. Lawrence and George R. Tuttle, San Francisco, Cal., of counsel) for the plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon and Joseph E.

Weil, New York City, trial attorneys), for the defendant.

Before OLIVER, Chief Judge, and MOLLISON and WILSON, Judges.

WILSON, Judge.

The above-entitled protest was submitted for decision upon the following stipulation entered into between counsel for the respective parties:

"Mr. Tuttle: I offer to submit this protest upon a stipulation that I will read as a proposal, being as follows:

"The merchandise covered by this protest was imported by plaintiff at the Port of Seattle, and entered for consumption March 23, 1951. It consists of tuna fish, prepared or preserved, packed in oil, or in oil and other substances, and assessed with duty at the rate of 45 per cent ad valorem, under Paragraph 718(a), Tariff Act of 1930, as modified by Presidential Proclamation of December 14, 1933, T.D. 46795.

"Like merchandise was specified as dutiable at 22½ per cent ad valorem, under Paragraph 718(a), as modified by the Trade Agreement with the United Mexican States, which was proclaimed by the President on December 23rd and 31st, 1942, T.D. 50797, page 205, 57 Stat. 833 and 909, and was terminated by the Presidential Proclamation of September 6, 1950, T.D. 52559, 64 Stat., [A] 427.

"That is the end of the proposal. I propose that stipulation.

"Mr. Weil: Government so stipulates."

Reference to the statutory provisions and certain Presidential proclamations, as follows, are here deemed pertinent:

Under the Tariff Act of 1930, fish, packed in oil, was dutiable at 30 per centum ad valorem under paragraph 718 (a) thereof. 19 U.S.C.A. § 1001, par. 718(a). However, under the flexible provisions of the tariff act (section 336 of the Tariff Act of 1930, 19 U.S.C.A. § 1336), the President, by proclamation No. 2066, dated December 14, 1933, 48 Stat. 1722 (T.D. 46795), increased the rate of duty to 45 per centum ad valorem on tuna fish, packed in oil. On December 31, 1942, the trade agreement with Mexico became effective by reason of Presidential proclamation (T.D. 50797), and the 45 per centum rate of duty as applied to fish, packed in oil, was reduced to 22½ per centum ad valorem. The latter rate was the applicable rate of duty on January 1, 1945, the date set in the "Trade Agreement Extension Act of 1945" as determinative of the rate of duty below or above which the President by proclamation under the "Trade Agreement Act" could not decrease or increase duties by more than 50 per centum. Thereafter, by Presidential Proclamation No. 2901, dated September 6, 1950 (T. D. 52559), U.S.Code Cong.Service 1950, p. 1528, the Mexican Trade Agreement was terminated.

The contentions of the plaintiff in this case are twofold: (1) That the increase in the rate of duty from 22½ per centum ad valorem to 45 per centum ad valorem, the rate at which the involved merchandise was assessed, violates the Trade Agreement Extension Act of 1945; and (2) that the 45 per centum rate of duty created under the flexible provisions of the tariff act, section 336 of the Tariff Act of 1930, ceased to exist upon the effectiveness of the trade agreement with Mexico and that the same was not restored. Plaintiff, accordingly, maintains that the merchandise in question should be held dutiable at 30 per centum ad valorem under paragraph 718(a) of the Tariff Act of 1930.

Counsel for the defendant, in its brief, directs our attention to the cases of United States v. Metropolitan Petroleum Corp., 42 C.C.P.A., Customs, 38, C. A. D. 567, certiorari to the Supreme Court denied in Metropolitan Petroleum Corp. v. United States, 348 U.S. 858, 75 S.Ct. 82, 99 L.Ed. 676, and United States v. American Bitumuls & Asphalt Co., 246 F.2d 270, 44 C.C.P.A., Customs, 199 C. A. D. 661, certiorari to the Supreme Court denied in American Bitumuls & Asphalt

Co. v. United States, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113, as authorities for the imposition of the rate of 45 per centum ad valorem herein assessed on the involved merchandise.

In the Metropolitan Petroleum Corp. case, supra, the involved merchandise consisted of fuel oil imported from Netherlands West Indies, which was assessed with a tax of ½ cent per gallon upon entry in accordance with section 3422 of the Internal Revenue Code, 26 U.S. C.A. § 3422. It appeared that, by authority of the Reciprocal Trade Agreements Act of 1934 (section 350 of the Tariff Act of 1930, 19 U.S.C.A. § 1351), authorizing the President to enter into trade agreements with foreign Governments and to proclaim the rates necessary to put such agreements into effect, limiting such changes in duties to 50 per centum of the rates in effect when the law was passed and to terminate any such proclamation at any time in whole or in part, a trade agreement with Venezuela was negotiated and a rate of ¼ cent per gallon on fuel oil not in excess of a certain tariff quota was proclaimed, effective December 16, 1939. In the same agreement, the rate of ½ cent per gallon on fuel oil in excess of the designated quota was retained. By a later trade agreement with Mexico, proclamation effective January 30, 1943, 57 Stat. 833, the rate on fuel oil was reduced to ¼ cent per gallon. By act of 1945, section 350 of the tariff act was amended to provide that no proclamation could be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945. The rate of tax on fuel oil in effect on January 1, 1945, was the rate provided for in the trade agreement with Mexico of ¼ cent per gallon. Proclamation 2901 was, thereafter, issued by the President, effective January 1, 1951, which terminated the Mexican Trade Agreement by mutual consent of the contracting parties, and the further purpose of said proclamation was to make certain changes in the existing rates of duty that were required or appropriate to carry out the provisions of, inter alia, the Venezuelan Trade Agreement, and the rate of tax on fuel oil was determined by said President's proclamation 2901 to be ½ cent per gallon. Said proclamation further recited that an earlier trade agreement had been entered into between the United States and Venezuela, effective December 14, 1940, that had fixed a duty of ¼ cent per gallon on a limited quantity of crude petroleum and certain petroleum products, including fuel oil derived from petroleum. The balance remained taxable at the statutory rate of ½ cent per gallon. The importers claimed that proclamation 2901, supra, should be construed as having increased the rate of tax on fuel oil by more than 50 per centum above the rate imposed on such fuel oil on January 1, 1945, and that such increase was, therefore, in violation of section 350, as amended.

The Government, in the case above cited, contended that the action of the President in proclaiming the termination of the Mexican Trade Agreement did not require any reference therein to the Venezuelan Trade Agreement; also, that the declaration by the President as to the rate applicable to imports from Venezuela was unnecessary and was merely included, presumably as a guide, for those whose duty it was to carry out the law relating to our trade agreement program. In essence, therefore, the Government's argument was directed to the proposition that the proclamation terminating the Mexican Trade Agreement had the effect of restoring, by operation of law, the rate of tax which was applicable immediately prior to the effective date of the trade agreement so terminated. In this respect, it was argued that, despite the fact that such restored rate of tax was more than 50 per centum higher than the rate in effect on January 1, 1945, the President acted within his authority under section 350, as amended, supra, regardless of whether or not the said proclamation recited a new rate. It was the position of the appellees therein

that the language of section 350, as amended, *supra,* clearly stated that no proclamation could be made which increased by more than 50 per centum the rate of duty existing on January 1, 1945.

Our appellate court, in the Metropolitan Petroleum Corp. case, supra, one judge dissenting, held that the proper rate of tax applicable to the involved merchandise was ½ cent per gallon, as assessed. In so holding, the court observed that it was reasonable to impute to Congress, without any expression therefrom at the time it passed the amendment to the Tariff Act of 1930 dealing with the 50 per centum prohibition in question, knowledge of the fact that the Venezuelan Trade Agreement had been executed and was in full force and effect, except for the fact that the particular rate on fuel oil therein specified had been suspended temporarily under the provisions of the Mexican Trade Agreement, and that, but for the existence of the Mexican Trade Agreement, the importation in question would have admittedly been subject to the tax of not more than ½ cent per gallon; that the Venezuelan Trade Agreement was a solemn binding document between the United States and Venezuela; and that Congress was charged with the knowledge, not only of the fact that the Venezuelan Trade Agreement existed, but also that "it would continue to exist until it was itself terminated appropriately through the well recognized procedure covering such cases." In the above connection, the court, 42 C.C.P.A., Customs, at page 46, stated:

" * * * To say, however, that an agreement, such as was the Mexican document, upon its termination could be the vehicle to do indirectly that which we think the Venezuelan Trade Agreement required to be done directly is without support in reason or logic. It would possibly have been the better course for the document terminating the Mexican Trade Agreement to have omitted the reference to the Venezuelan

Trade Agreement and thereby subject the importation in question admittedly to the provisions of the Venezuelan Agreement, which would have been in effect automatically following its temporary suspension under the Mexican Agreement. * * *"

In the American Bitumuls & Asphalt Co. case, supra, the issue therein was identical to that presented in the Metropolitan Petroleum Corp. case, supra. The pertinent facts were as follows:

Under certain provisions of the Internal Revenue Code, Congress imposed a tax of ½ cent per gallon on imported crude petroleum. Subsequently, under the aforesaid trade agreement with Venezuela, the statutory tax of ½ cent per gallon on crude petroleum was, by President proclamation, reduced to ¼ cent on said imports not exceeding the quota previously indicated. As to crude petroleum in excess of that quota, the agreement did not affect the tax which thus remained at ½ cent per gallon, the rate established by the Internal Revenue Code.

Thereafter, as heretofore outlined, under the trade agreement with Mexico, the tax was reduced by Presidential proclamation to ¼ cent per gallon on all crude petroleum imported.

Under the act of July 5, 1945, part (a) (2) of section 350 of the Tariff Act of 1930 was amended as follows:

"No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, *however established, existing on January 1, 1945* (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists." (Emphasis ours.)

The parties, in the American Bitumuls case, supra, agreed that the "established rate of duty" on crude petroleum on January 1, 1945, within the meaning of the proviso above quoted, was the tax of ¼ cent per gallon and that the ¼-cent rate was established by the proclamation of the Mexican agreement.

Proclamation 2901, T.D. 52559, terminated the Mexican Trade Agreement, and the collector, in said American Bitumuls case, assessed a tax of ½ cent per gallon under the authority of said proclamation.

The majority of the court, in the American Bitumuls case, supra, in resolving the question there at issue, 246 F.2d at page 274, 44 C.C.P.A., Customs, at page 204, observed:

"It is to be noted that in paragraph (a) (2) as originally drawn the prohibition against rate changes of more than 50 per cent of 'any existing rate of duty' was based on rates in existence at the time of its enactment. It was therefore impossible for the termination of *any* proclamation to effect a change of more than 50% since the termination could do no more than restore a rate which had been legally established either by statute or by a previous proclamation and which served as the base of the 50% prohibition. At that time, therefore, there was no reason for associating the 'No proclamation' provision with the *termination* of proclamations. It was only when the amendment of 1945 was made, establishing *new base rates*, that it became possible for a terminating proclamation to effect a change of more than 50 per cent of the *new base rate*.[1] If it had been the intention of Congress at that time to impose a new limitation on the terminating power, it seems reasonable to suppose that it would have done so by an express reference to that power.

"The final sentence of paragraph (a) (2) of Section 350, literally construed, gives the President unqualified power to terminate *any* proclamation which he has made under that paragraph; and since it appears to be agreed by the parties that such termination cannot affect rates of duty unless it is proclaimed, it is evident that the paragraph *must* be construed as empowering the President to *proclaim* the termination of *any* proclamation, even if such termination has the effect of raising a rate 100%. It thus seems evident that the second and fourth sentences of the paragraph cannot both be literally construed. Either the second sentence must be read as excluding proclamations which terminate other proclamations, or the fourth sentence must be read as excluding terminating proclamations which would have the effect of increasing or decreasing duties by more than 50 per cent of the 1945 rate. * * *" (Italics quoted.)

and, 246 F.2d at page 275, 44 C.C.P.A., Customs, at page 205:

"There is a logical reason for placing a limitation on the tariff changes which may be effected by proclamations giving effect or carrying-out trade agreements but not on those which merely *terminate* other proclamations, since the latter can do no more than restore rates which have already been legally established, and are thus inherently limited. (Italics quoted.)

* * * * * *

"In view of the circumstances above set forth, we conclude that the prohibition contained in the second sentence of paragraph (a) (2) of Section 350 of the Tariff Act of

[1] This case involves the mathematical phenomenon that a reduction from ½ cent to ¼ cent is a 50% reduction while a restoration from ¼ cent to ½ cent is a 100% increase. This causes no difficulty under the language of the second sentence of paragraph (a) (2) so long as the "rate of duty" serving as the base, against which the percent of change is measured, is fixed. But when a duty resulting from a 50% decrease is established as a new base, *after* the making of the reduction, as was done by the 1945 amendment, mere restoration of the original rate is bound to be an increase of 100%. This simple arithmetical fact underlies all of the litigation in this and the Metropolitan cases. [Italics quoted.]

1930, as amended by the Act of July 5, 1945, is not applicable to proclamations which *terminate* other proclamations." (Italics quoted.)

We are of opinion that the holding of our appellate court in the Metropolitan Petroleum Corp. and American Bitumuls cases, supra, is decisive of the issue herein. The court, in those cases, held that the words "No proclamation" ("shall be made increasing * * * by more than 50 per centum any rate of duty, however established, existing on January 1, 1945"), as appearing in section 350(a) (2) of the Tariff Act of 1930, as amended, apply only to proclamations giving effect to trade agreements and that the language is not applicable to proclamations which terminate other proclamations. Accordingly, the provisions of section 350(a) (2) of the Tariff Act of 1930, as amended, with respect to the 50 per centum limitation, are not applicable to the proclamation which terminated the Mexican trade agreement (T. D. 52559). As was stated by the court, in the American Bitumuls case, supra, section 350(a) (2) of the Tariff Act of 1930 gives to the President unqualified power to terminate any proclamation which he has made under *that* section, and the power must be construed as empowering the President to proclaim the termination of any proclamation, even if such termination has the effect of raising a rate 100 per centum.

In the American Bitumuls case, supra, the court, in referring to the opinion of the court in the Metropolitan Petroleum Corp. case, supra, observed, page 208, that the opinion of the court in the Metropolitan case was based on the premise that the Venezuelan Trade Agreement was in effect, and remained in effect, by virtue of an unrescinded proclamation. The same situation, in our opinion, prevails in the case at bar. Here, it does not appear that there has been any proclamation which has *terminated* proclamation 2066, dated December 14, 1933, T.D. 46795, under which latter proclamation there was provided the rate of 45 per centum ad valorem on "tuna fish, prepared or preserved in any manner, when packed in oil or in oil and other substances." In this connection, it appears significant to note that section 336(f) of the Tariff Act of 1930 provides:

"(f) Modification of changes in duty.—Any increased or decreased rate of duty * * * which has taken effect as above provided may be modified or *terminated* in the same manner and subject to the same conditions and limitations * * * *as is provided in this section* in the case of original increases, decreases, or changes." (Italics supplied.)

Counsel for the plaintiff, in his reply brief, calls our attention to the fact that, pursuant to a resolution adopted by the Committee on Finance, United States Senate, on August 20, 1957, the United States Tariff Commission, on the 26th day of August 1957, instituted an investigation under the provisions of section 332 of the Tariff Act of 1930, 19 U. S.C.A. § 1332 with respect to tuna fish, supplemental to the investigation under section 332 made by the Commission pursuant to a Finance Committee Resolution of June 26, 1952. Section 332 of the tariff act provides:

"(d) Information for President and Congress.—In order that the President and the Congress may secure information and assistance, it shall be the duty of the commission to—

"(1) Ascertain conversion costs and costs of production in the principal growing, producing, or manufacturing centers of the United States of articles of the United States, whenever in the opinion of the commission it is practicable;

"(2) Ascertain conversion costs and costs of production in the principal growing, producing, or manufacturing centers of foreign countries of articles imported into the United States, whenever in the opinion of

the commission such conversion costs or costs of production are necessary for comparison with conversion costs or costs of production in the United States and can be reasonably ascertained; * * *"

Plaintiff contends that the above-referred-to investigation under section 332 of the tariff act is confirmative of plaintiff's claim that the flexed rate of 45 per centum is not applicable to the imported merchandise. However, whatever may be the result of said investigation, we have with respect to the imported merchandise a rate of duty issued under a Presidential proclamation, which proclamation has not been rescinded by a further proclamation issued by the President.

The arguments advanced in plaintiff's briefs respecting the intended effect of section 336 in contrast to that of section 350(a), the Trade Agreements Act, are not, in our opinion, pertinent in the determination of the present issue. Accordingly, we hold that proclamation 2066, issued under the provisions of section 336 of the Tariff Act of 1930 (T. D. 46795), wherein the rate of 45 per centum ad valorem was imposed on "tuna fish * * * when packed in oil or in oil and other substances" was in effect upon the termination of the Mexican Trade Agreement and so remains until such time as said proclamation itself is rescinded. The proclamation imposing a rate of 45 per centum on tuna fish, not having been rescinded, the merchandise here in question is subject to that rate of duty imposed under the provisions of section 336 of the act.

For all of the reasons stated aforesaid, we hold that the imported merchandise is dutiable as "tuna fish * * * when packed in oil or in oil and other substances" under paragraph 718(a) of the Tariff Act of 1930, as modified by Presidential proclamation 2066, T.D. 46795, at the rate of 45 per centum ad valorem, as assessed. The protest is overruled.

Judgment will be rendered accordingly.

MOLLISON, Judge (concurring in conclusion).

I concur, with some reservations, in the conclusion reached by my colleagues. My reservations are occasioned by some doubt as to whether the effect of a proclamation terminating in whole a previous proclamation initiating or effectuating tariff changes and issued under the authority of section 350 of the tariff act, as amended, is in all cases to restore the *status quo ante* the initiating proclamation.

This, of course, depends upon whether the effect of the promulgation of new and superseding tariff rates or import restrictions is to work a repeal of the former rates or restrictions or merely to suspend the same with inherent self-generating power to return to operation without being specifically, and with respect to each rate or restriction, proclaimed by the President pursuant to some constitutionally delegated power from the Congress.

If (1) the issuance of an initiating proclamation under section 350, *supra,* effects a repeal, rather than a suspension, of the tariff law with respect to the duties or import restrictions lawfully in operation prior to the taking effect of the proclamation, and (2) the termination of that proclamation is a repeal of the law as proclaimed by the President, it does not seem to be open to question but that section 108 of Title 1 United States Code, cited by counsel for the plaintiff, would be applicable. That section reads as follows:

"108. Repeal of repealing act. Whenever an Act is repealed, which repealed a former Act, such former Act shall not thereby be revived, unless it shall be expressly so provided."

See Kohlsaat v. Murphy, 96 U.S. 153, 24 L.Ed. 844; Chicago, Milwaukee & St. Paul Railway Co. v. United States, 127 U.S. 406, 409, 8 S.Ct. 1194, 32 L.Ed. 180; United States v. Boasberg, D.C., 283 F. 305, 308; and also Milne v. Huber, 17 Fed.Cas. 403, No. 9,617, and Bender v.

United States, 3 Cir., 93 F.2d 814, holding that the statute applies as well to repeals by implication or repugnancy as to express language.

So far as direct language is concerned, section 350, *supra,* is silent on the subject of whether it was the intention of the legislature that upon compliance with the conditions precedent expressed in that section and the issuance of a Presidential proclamation thereunder the current law on the subjects covered by the proclamation was to be *suspended* or was to be *repealed.*

In contradistinction, in section 3 of the Tariff Act of 1890, which was the subject of the decision of the Supreme Court of the United States in Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 506, 36 L.Ed. 294, and which likewise had for its purpose the fostering of reciprocal trade, the President was authorized "to suspend, by proclamation to that effect" the provisions of that act with relation to the free entry of the items of merchandise specified, and during such suspension certain duties were to be in effect on the importation of such items. Suspension implies that restoration of the *status quo* is to follow the end of the suspension.

Under section 350, *supra,* and under section 336, the flexible tariff provision, there is no suggestion of suspension. On the contrary, the President in each case is to *proclaim* duties or import restrictions, and it would seem that his act, as the agent of Congress, is of the same nature and quality as would be that of Congress itself, if it were to establish new and superseding tariff rates or import restrictions (J. W. Hampton Jr. & Co. v. United States, 276 U.S. 394, 411, 48 S.Ct. 348, 72 L.Ed. 624, and William A. Foster & Co., Inc. v. United States, 22 C.C.P.A., Customs, 59, T.D. 49599). It would hardly be considered, if Congress directly legislated upon the subject by enacting new tariff rates or import restrictions, that when the new rates or restrictions superseded the prior rates or restrictions, the latter were merely suspended from operation. On the contrary, it would be considered that they were completely eliminated from the tariff act.

In the Metropolitan and American Bitumuls cases, cited by counsel for the defendant and relied upon by the majority as dispositive of the issue, the situation was not quite the same as in the present case, and the *ratio decidendi* of those cases is not directly applicable here. Those cases related to changes in tariff rates initiated by successive Presidential proclamations based, in turn, upon successive trade agreements, which proclamations were issued, and which trade agreements were entered into, under the authority of section 350, *supra.*

It is clear that it was the view of our appellate court that so long as the *external obligation* of the United States, represented by the first trade agreement, existed, the rates specified therein and the proclamation issue in connection therewith must be considered not to have been repealed or eliminated by the lower and inconsistent rates called for by the second trade agreement and proclamation issued in connection therewith, but to have been placed in a state of dormancy or suspension with inherent power therein to return to operation upon the happening of a certain event—the termination of the second agreement and the proclamation *issued in connection therewith.*

While it is true that, in this case, there were successive Presidential proclamations changing the rate of duty applicable to merchandise such as that at bar, only one of those proclamations, the second, was authorized by section 350, *supra,* and issued in connection with a trade agreement entered into under that authority. The first proclamation (No. 2066, December 14, 1955, T.D. 46795) was issued under authority of section 336, the flexible tariff provision of the act of 1930.

There was consequently no other *external obligation* of the United States on the same subject matter in force and effect during the life of the second Presi-

dential proclamation issued in connection with the Mexican Trade Agreement. If, therefore, the result which obtained in the Metropolitan and American Bitumuls cases, supra, properly obtains in this case, i. e., that upon the termination of a trade agreement and Presidential proclamation issued in connection therewith, the tariff *status quo ante* the proclamation is restored, it must be for a reason other than the existence of an external obligation of the United States, i. e., a prior trade agreement, and a Presidential proclamation issued in connection therewith.

The provision of section 350, *supra,* with respect to the termination of previous initiating proclamations is very meager and certainly does not, of itself, reveal the legislative intent. While there are expressed conditions precedent to the issuance of an *initiating* proclamation, there are no expressed conditions precedent to the *termination* of the same. Compare the provisions of section 336(f) of the Tariff Act of 1930. In that case, the termination can only follow the performance of certain conditions precedent, i. e., must be done in the same manner and subject to the same conditions and limitations as were followed in the case of the initiating proclamation.

It may very well be that from the fact that, under section 350, *supra,* a prior initiating proclamation changing tariff rates or import restrictions may be terminated, the suspension, rather than the repeal, of the tariff *status quo ante* may be implied. Or it may be that the powers of the President under the reciprocal trade agreements provision of the tariff act are of like nature and subject to similar construction as those which were the subject of Field v. Clark, supra. In either case, of course, the conclusion reached by the majority in this case would follow. I prefer to base my concurrence in that conclusion on those reasons rather than on the decisions in the Metropolitan and American Bitumuls cases, supra, which, it seems to me, differ both as to facts and the basis for the law applied.